FILED

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

2012 APR -3  PH 12: 59

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

MATTHEW C. BROWN,

      Plaintiff,

      vs.

CASE NO.  3: 12 CV-365 - J- 32 JBT

ANHEUSER-BUSCH COMPANIES, LLC,
a foreign limited liability company, f/k/a
ANHEUSER-BUSCH, INC., a foreign
corporation,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Matthew C. Brown sues Anheuser-Busch Companies, LLC f/k/a Anheuser-Busch, Inc. and alleges:

### (Preliminary Statement and Jurisdiction)

1.      This is a suit for racial employment discrimination and retaliation arising from Defendant's 4-week suspension of Plaintiff in late 2009 and termination of him in March of 2010.  Plaintiff seeks damages, appropriate equitable relief, and an award of costs and reasonable attorney's fees under Title VII, Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), 42 U.S.C. §§ 1981 ("§ 1981"), 1981a , 1988 ("§ 1988"), and the Florida Civil Rights Act, Fla. Stat. §§ 760.01-.11 ("FCRA").  The Court has federal question jurisdiction over this action under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 2000e-5(f)(3) and supplemental jurisdiction over the FCRA claims under 28 U.S.C. § 1367 that arise from the same adverse employment actions as the federal claims.

(Parties and Venue)

2.      Plaintiff Matthew C. Brown ("Plaintiff" or "Brown") resides in Jacksonville,
Florida, where he was employed from 2004-2010 by Defendant at its Jacksonville brewery.  His
race is African-American or Black.

3.      Defendant Anheuser-Busch Companies, LLC, ("Defendant" or "AB") is a foreign
limited liability company which through its predecessor corporate entity, Anheuser-Busch, Inc., a
foreign corporation, previously employed Brown at its Jacksonville brewery. AB primarily makes
and distributes various brands of beer.

4.      At all relevant times Brown was an "employee" or "person" entitled to the rights
and protections against employment discrimination on the basis of race and retaliation for having
protested racial discrimination and AB an "employer" or "person" subject to the obligations to
refrain from such discrimination or retaliation under Title VII, § 1981, and the FCRA.

(Statement of Claim)

5.      Brown was initially hired by AB in September, 2004, to work as a "weekender"
at AB's Jacksonville brewery.  By all objective measures (absence of discipline, pay raises,
promotions, and performance evaluations) over time he proved himself a skilled, reliable, and
dedicated employee of AB, holding various positions "on the line," operating the automated
systems that fill the cans with various beers.   In October of 2007, Brown was elected shop
steward and became more active in his union, National Conference of Brewery and Soft Drink
Workers, and Teamsters Local 947 ("Union").  In 2009, Brown became qualified and moved into
the position of "Depal Operator," the person responsible for "depalletizing" or unloading the
pallets of cans onto the automated lines for filling.

-2-

6.     Throughout the period of Brown's employment with AB, he and other union-represented employees were subject to a progressive disciplinary system and governed by the terms and conditions and grievance procedures of a collective-bargaining agreement between AB and the Union ("CBK").

7.     Although AB has formal policies against discrimination and both AB and the Union have agreed in the CBK to refrain from discrimination, the reality of the environment in which Brown worked was not a pristine one, free from all racial conflicts, hostility, and, on occasion, overt racial discrimination. During Brown's tenure at AB, the Union never had a Black officer. While Blacks were hired and employed by AB, Blacks sometimes complained of under-representation in the workforce and hiring practices and were often relegated to less desirable positions. For example, while Blacks with more seniority often requested to be trained for sought-after oiler positions, AB generally refused those requests while at the same time training white employees with less seniority for them.  Of the few Blacks that make it into management, many have been pressured to leave and are more often than not replaced with whites.  Racial slurs and symbols (*e.g.,* wearing of confederate flags on T-shirts and rebel hats) at times heightened racial tensions and conflicts and would be tolerated until one or more Black employees formally complained.  White employees forced to stop such overt racial practices would grumble and some would go so far as to get tattoos with racial overtones, vowing they could not be made to remove those.   As Brown himself would later experience, sometimes good ol' boy white managers would sometimes take concerted action to single out Blacks for heightened scrutiny and discriminatory treatment.

8.     Prior to 2009, Brown had one minor disciplinary blemish on his record.  In 2007

-3-

he cut his finger and received a written reprimand for allegedly violating a safety regulation. Under the terms of the CBK, after the passage of two years, prior disciplinary actions are effectively removed from an employee's record and cannot be considered in connection with the imposition of any discipline for alleged infractions or misconduct occurring after the expiration of this 2-year period.  Brown's resumed good conduct for more than 2 years following this 2007 safety infraction effectively removed it from his records.

   9. In June, 2008, Brown and another Black co-worker had a particularly hostile and disturbing run in with a white area manager, Vern Longnecker.  When a production line had stopped, Longnecker unfairly accused Brown and his co-worker of being "sorry asses" who were "bull-shitting" and goofing off.  When Brown sought to explain and to apologize when he left to restart the filler, Longnecker followed him continuing the stream of foul language and invective and said "you people should be thankful you had a job" there.  The shouting tirade continued and escalated to Longnecker forcefully grabbing Brown's shoulder and not letting Brown return to his work as he, Longnecker, took calls on his cell phone.  The hostile encounter ended with Longnecker yelling at Brown that he was tired "dealing with you people."  Brown complained to his group manager and the following day provided details to HR about the encounter with Longnecker and a list of witnesses.  Evidently after HR completed its investigation, Longnecker was terminated.   However, some of Longnecker's manager friends never forgot what happened.

   10. On or about August 17, 2009, Brown questioned his group manager, Tony Balsamo, who was good friends with Vern Longnecker, about a notice of violation and written reprimand he had initiated against Dondi Grays (who is light complected), who had been working the line about producing "scuffed trays".  Employee Grays had complained to Brown as Shop Steward

-4-

that he had only done what Tony Balsamo had ordered him to do – to keep the line running and to use the trays. When Brown attempted to question Balsamo about whether, he, Balsamo, had instructed Grays to run those trays, Balsamo got defensive, told Brown to see Balsamo's report, and did not respond to the question. When Brown asked the question again, Balsamo curtly and angrily stated, "Like I said before, it's in my report. I have no more comments" or words to that effect.

11. On or about September 8, 2009, Brown had already timely clocked in and was standing in the production line area  talking to Troy Minsheu and Diane Concilla about matters concerning the production line as they customarily did when the shift changed. Later that shift, and despite never saying anything to Brown during several prior opportunities to bring the matter up, Tony Balsamo finally met with Brown and told Brown that he had been instructed to dock Brown's pay 15 minutes for being tardy and not being at his assigned duty station at the start of the shift. Brown explained the customary relief briefing procedures and how those kept Brown away a few minutes at the start of his shift. Balsamo seemed to understand but only repeated that he was doing what he had been told by Darrell White to do. Brown returned to his work station and finished his shift.

12. The next day September 9, 2009, at the start of his shift, Brown asked Darrell White if he had instructed Tony Balsamo to dock Brown's pay 15 minutes for being late. White explained that he had not and that Brown would have to take the matter up with Balsamo. While Brown had been talking with White, Balsamo entered the office and as the shop steward Brown approached Balsamo and asked him to rectify the tardy because Brown had not been late. Balsamo said he could not do that and Brown then told  Balsamo that White had denied

-5-

instructing Balsamo to write Brown up for a tardy.  At that point and confronted with his outright lie, Balsamo tried to cover his tracks first with Darryl White and then by disallowing Brown to wait for Balsamo's manager who had been summoned to the office to address this unfair tardy. Although line workers would often leave their duty stations and go to the office to discuss various matters (particularly if the line was operating properly as Brown's was at that time just as it had done the day before when Brown was summoned to speak to Balsamo) Balsamo refused to let Brown wait a couple minutes and arbitrarily and heatedly ordered  Brown to return to his station.  Balsamo refused to discuss the matter with a different shop steward who happened to walk by and shortly thereafter hurriedly and angrily left.

13.     A few minutes later Balsamo returned with the originally summoned manager and after Balsamo had briefed him without the benefit of Brown's input.  That manager immediately told Brown that he could not disregard an order.  Brown explained that he had been looking to resolve his pay getting docked for a non-existent tardy and that the line had been running fine and never once had gone down.  Brown acknowledged to the other manager that perhaps he should have handled the situation differently but that the lying by Balsamo had to stop. Balsamo then proceeded to try to justify the tardy write up with yet more lies.

14.     It had been past practice that being in the work area (getting relief briefings) rather than at one's duty station at the start of the shift was acceptable.  Nothing in the CBK contradicted that and other non-minority line operators who were often not at their stations at the start of their shifts had never been docked as tardy.  However, at the step 1 meeting on September 11, 2009, Balsamo's docking of only Brown's pay was sustained even though it was clear that Balsamo had singled Brown out for being tardy.  Balsamo's manager ended that meeting noting

-6-

he was uncertain whether a notice of violation would be issued Brown for insubordination.

15.     From September 14-21, 2009, Brown took vacation.

16.     After returning to work and at the end of a group safety meeting on September 23,
2009, Balsamo's manager called Brown to the line office and issued him a notice of violation for
insubordination and intent to impose a progressive-discipline-jumping 4-week suspension.

17.     On or about October 4, 2009, Brown worked for Balsamo on can line 3 as service
relief. Balsamo tried, without success, to get Brown written up for failing to do his job properly
and being away from his assigned place of duty at some point during Brown's shift.

18.     On or about October 6, 2009, after exchanging pertinent line information with
others at the start of his shift, Antonio Johnson and Brown were walking to their duty stations
when Balsamo summoned Brown to come to the office while Antonio Johnson was allowed to
continue to his station. Balsamo told Brown to have a seat and then told Brown that he was late
again and that Balsamo would dock his pay and charge him with another tardy. He ordered
Brown to go to the cafeteria and take a 15 minute break. Brown asked if he could have his shop
steward present while Balsamo was telling him this. Balsamo then became belligerent and told
Brown to go to the cafeteria which Brown did. Balsamo also falsely claimed that Brown had
threatened him in response to being told he was tardy again.

19.     Later on that same day, October 6, Brown complained to HR and sought to meet
with his department head about being unfairly singled out and tried to get Balsamo's actions
corrected. No corrective action was taken or promised. Instead, the department head
purposefully avoided meeting with Brown.

20.     Later during his shift on October 6, Brown was summoned to come to office of

-7-

Lesa Brown, again leaving his duty station and the production line. Balsamo was also there and told Brown he was putting him on notice for being late. Brown left without arguing and proceeded to return to his station. Brown was forced to use a personal sick day in order to avoid another tardy violation.

21.    While en route back to his station after being summoned to Lesa Brown's office, Brown was walking when Tony Balsamo on his scooter came along side Brown and said: "Vern [Longnecker, Balsamo's friend] told me how to get your black ass, all you D.A.N.'s are the same." D.A.N. is a racial slur, sometimes used by co-workers and supervisors alike at AB's Jacksonville brewery meaning "Dumb Ass Nigger."

22.    On or about December 4, 2009, Brown filed an administrative charge of racial discrimination with the EEOC over the proposed 4-week disciplinary suspension that Balsamo had instigated.

23.    Despite then having a clean record, a system of progressive discipline in which a 4-week suspension was the next most severe discipline topped only by termination, the extenuating circumstances behind the charge of disobeying Tony Balsamo's arbitrary directive, the lesser discipline non-minorities had received for far more egregious instances of insubordination, and the untimeliness of the violation under the CBK, on or about December 10, 2009, the Union's grievance over Brown's 4-week suspension for insubordination was rejected.

24.    Under the terms of the CBK, AB had 5 working days from receipt of notice of the final decision on the grievance within which to commence the discipline. However, it was not until on or about December 22, 2009, that Brown received notification from AB that his 4-week suspension would be served from January 4-31, 2010.

-8-

25.     Upon returning to work on or about February 1, 2010, Brown resumed his primary duties as Depal Operator.

26.     On February 24, 2010, as a result of a mix-up and while Brown was on a 30-minute break, the wrong cans got loaded from the depalletizer resulting in 1200+ cases of the wrong beer going into the wrong cans. As a result of this mix-up, the product had to be destroyed.

27.     Brown was not actually aware of the misload, did not sign for the split load, was not briefed by his relief after the split load was signed for by his relief, and did not select the lanes for the new can selection. After the mix-up, Tony Balsamo who was not scheduled to work the area that day, met with Group Manager Pat Burris, another good friend of Vern Longnecker and who had recently and unjustly accused Brown of "fucking with him" when there had been problems with the line.  Immediately after that meeting Burris met with Brown. Burris initially denied meeting with Balsamo when asked by Brown.  With a smirk on his face, Burris then told Brown that because of the mix-up he was placed on notice of violation for possible termination.

28.     Following this February 24 mix-up incident, on March 3 and 4, Balsamo purposefully assigned Brown menial tasks to perform that took him away from his Depal station in an effort to distract Brown and cause another possible product mix-up.

29.     The relief Depal Operator, Antonio Johnson, who had taken over for Brown while he was on break and failed to set the pallet countdown which could have avoided the February 24 mix-up was not disciplined.  Neither the Filler operator who could and should have also spotted the mix-up and stopped the line nor anyone else with shared responsibility for the mix-up was either disciplined or disciplined as severely as Brown.  Although this was Brown's first line of

-9-

production infraction in over 5 years of employment, he alone received the progressive-discipline-jumping ultimate sanction for his role in this mix-up.

      30.     Mix-ups such as this can be costly for AB. However, they had happened before at AB's Jacksonville brewery and with some frequency though never previously on Brown's shift. Prior to and after Brown, however, no Depal or Filler Operator ever lost his or her job because of such a mix-up even with incidents in which more cases of product were lost.

      31.     Comparably situated, non-minority operators who had never previously complained of unlawful discrimination including those with more egregious prior infractions than Brown including at least one who had intentionally shut down the production line and others who had caused the loss of more product than Brown were not terminated for a product mix-up.

      32.     As a result of Brown's 4-week suspension and his termination, he has lost wages, suffered emotional distress and mental anguish, and in connection with his termination lost fringe benefits. He could not find another job for over a year and when he did finally secure one, it paid less than what he made at AB and with less fringe benefits.

      33.     Plaintiff has satisfied all conditions precedent to suit under Title VII and the FCRA.

    (Count I: Racially Discriminatory Suspension In Violation of Title VII, § 1981, and FCRA)

      34.     Plaintiff realleges and incorporates by reference the allegations of ¶¶ 2-24, and 33.

      35.     Brown was discriminated against because of his race when he received a 4-week suspension for alleged insubordination in violation of Title VII, § 1981, and the FCRA.

      Wherefore, Plaintiff requests that the Court exercise supplemental jurisdiction over his claims under the FCRA, grant trial by jury on all issues so triable as a matter of right and enter

-10-

judgment in his favor awarding him lost wages, prejudgment interest, compensatory damages for emotional distress and mental anguish, and his taxable costs including a reasonable attorney's fee under Title VII, § 1988, and the FCRA.

(Count II: Racially Discriminatory Termination In Violation of Title VII, § 1981 and FCRA)

36.     Plaintiff realleges and incorporates by reference the allegations of ¶¶ 2-33.

37.     Brown was discriminated against because of his race when he was terminated in violation of Title VII, § 1981, and the FCRA.

Wherefore, Plaintiff requests that the Court exercise supplemental jurisdiction over his claims under the FCRA, grant trial by jury on all issues so triable as a matter of right and enter judgment in his favor awarding him lost wages, prejudgment interest, compensatory damages for emotional distress and mental anguish, and his taxable costs including a reasonable attorney's fee under Title VII, § 1988, and the FCRA.

(Count III: Retaliatory Termination in Violation of Title VII, § 1981 and FCRA)

38.     Plaintiff realleges and incorporates by reference the allegations of ¶¶ 2-33.

39.     Plaintiff engaged in protected activity within the scope and protections of Title VII, § 1981, and FCRA when he filed his EEOC charge over his 4-week suspension protesting it as a product of race discrimination.

40.     AB managers responsible for the decision to terminate Plaintiff knew he had protested his 4-week suspension as racially discriminatory.

41.     Plaintiff was retaliated against in violation of Title VII, § 1981, and FCRA when he was terminated.

Wherefore, Plaintiff requests that the Court exercise supplemental jurisdiction over his

claims under the FCRA, grant trial by jury on all issues so triable as a matter of right and enter

judgment in his favor awarding him lost wages, prejudgment interest, compensatory damages for

emotional distress and mental anguish, and his taxable costs including a reasonable attorney's fee

under Title VII, § 1988, and the FCRA.

     Respectfully submitted for filing this 3rd day of April, 2012.

                    JEFFREY H. KLINK, P.A.
                    2319 Oak Street
                    Jacksonville, FL 32204-4603
                    TEL: 904.384.3855
                    E-MAIL: jhklink@gmail.com

BY: _____
                    JEFFREY H. KLINK
                    Florida Bar No. 151657

                    Counsel for Plaintiff
                    Matthew C. Brown